J. R. Swan, J.
The question arising by the demurrer, whether, under the constitution of 1851, an indebtedness or liability, such as. is disclosed in this contract, can be created against the state?
Under the act of 1845, the board of public works undertook to bind the state, by present obligation, to pay the plaintiffs and others, in installments running for five years, the gross sum of $1,375,000.
*It is proper for me to say, that until my attention was directly called by the argument of counsel to the various provisions’ of the constitution, applicable to the questions in this case, I entertained the impression that no part of the law of 1845 was in contravention of the constitution. That impression, however, has not only been removed, but, after a careful examination of the sub *476 ject, no doubt remains on my'mind, but that the law of 1845, so far as it authorizes contracts of repair beyond the period of two years, is inconsistent with the system of finance and expenditure created, by the constitution of 1851.
The provisions of the constitution which are involved in the questions before us, are as follows:
“Art. 12, Sec. 4. The general assembly shall provide for raising revenue' sufficient to defray the expenses of the state for each year.”
“Art. 2, Sec. 2. No money shall be drawn from the treasury, except in pursuance of a specific appropriation made by law; and no appropriation shall be made for a longer period than two years.”
“Art. 8, Seo. 1. The state may contract debts to supply deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct or contingent, whether contracted by one or more acts of the general assembly, or at different periods of time, shall never exceed seven hundred and fifty thousand dollars ; and the money arising from the creation of such debts, shall be applied to the pui'pose for which it was obtained, or to pay the debts so contracted, and to no other purpose whatever.
“ Sec. 2. In addition to the above-limited power, the state may contract debts to repel invasion, suppress insurrection, defend the state in war, or to redeem the present outstanding indebtedness of the state; but the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, or to pay such debts, and to no other purpose whatever; and all debts incurred to redeem the present outstanding indebtedness of the state shall be so contracted as to be payable *by the sinking fund hereinafter provided for, as the same shall accumulate.
“ Seo. 3. Except the debts above specified, in sections one and two of this article, no debt whatever shall hereafter be created by or on behalf of the state.”
If the genbral assembly, existing when these contracts were made, could have enacted the law of 1845, consistently with the provisions of the constitution, then the law itself must bo held constitutional; but if they could not have enacted such a law, then it must be held unconstitutional and void, unless saved by article 8, section 13, of the constitution. In discussing the validity of these contracts, therefore, it has been assumed for conven *477 ience of statement, that they were authorized by a law of the-general assembly existing when the contracts were made; although the law of 1845 did not in fact receive the sanction of that general assembly.
Before proceeding to state the scope and operation of these provisions of the constitution, it may be proper to allude to the general working of the financial system of the state, in respect of the payment of current expenses, and the creation of a debt.
The sole power of making appropriations of the public revenue is vested in the general assembly. It is the setting apart and appropriating by law a specific amount of the revenue for the payment of liabilities which may accrue or have accrued. No claim against the state can- be paid,- no matter how just or how long it may have remained overdue, unless there has been a specific appropriation made by law to meet it. Article 2, section 22.
By virtue of this power of appropriation, the general assembly exercise their discretion in determining, not only what claims against or debts of the state shall be paid, but the amount of expenses which may be incurred. If they authorize expenses or debts to be incurred, without an appropriation to pay them, and the expenses are incurred, those expenses create a debt against the state, and it must remain such, until payment under an appropriation afterward made.
The general assembly usually, however, provide for the current expenses for a period not. exceeding two years, out of the ^incoming revenues, by making appropriations of a sufficient amount of money to pay the expenses during that period, and provide by law for the raising of revenue sufficient to meet-the appropriations.
The discretion of each general assembly for the period of two-years in respect to the amount of expenditures, except in some-special cases relating to salaries, is without limit and without control ; but each must provide revenue and set apart a sufficient amount by a law operative within the same two years, to pay all expenses and claims.
This is the general system provided by the constitution. Article 2, section 22 ; article 12, section 4. Under it all the claims which are authorized, or which can accrue within each of the two years, and their payment, form one governmental and financial transaction ; so-that at the end of each of the two fiscal years the expenditures *478 .authorized and liabilities incurred have been provided for by revenue, adjusted by the executive officers, and out of the revenue previously set apart and appropriated, are paid.
So long as this financial system is carried out in accordance with .the requirements of the constitution, unless there is a failure or deficit of revenue, or the general assembly have failed for some •cause to provide revenue sufficient to meet the claims against the state, they do not and can not accumulate into a debt. Under this .system of prompt payment of expenses and claims as they accrue, there is, undoubtedly, after the accruing of the claim and before its actual presentation and payment, a period of time intervening in which the claim exists unpaid; but to hold that for this reason .a debt is created, would be the misapplication of the term debt, .and substituting for the fiscal period a point of time between the accruing of a claim and its payment for the purpose of finding a •debt; but appropriations having been previously made and revenue provided for payment as prescribed by the constitution, such debts, if they may be so called, are, in fact, in respect of the fiscal year, provided for, with a view to immediate adj ustment and payment. Such financial transactions are not therefore to be deemed •debts.
But if the general assembly should authorize liabilities to be incurred and make no appropriations to meet them,, but let each citizen who performed services or furnished materials to carry ■on the government, hold his claim against the state unpaid, debts to the amount of these claims against the state would at once be cre.ated, and remain debts at the end of the two years and until an appropriation was made to meet them, whatever public revenue might be on hand, inasmuch as every executive officer is forbidden by the ■constitution to pay any claim unless there has been a specific appropriation for that purpose made by law.
And for the same reason if, without appropriations or revenue provided, the general assembly should authorize contracts binding the state to pay specific sums of money to citizens within two years contingent upon their furnishing certain materials or labor, these ■contracts would at once create a contingent debt, and on perform.ance would become an absolute debt.
On the other hand, if appropriations were made, but the claims .authorized to be paid could not be and were not paid, on account •of there being no funds, such claims would also become debts.
*479 This general system, in its practical workings, has been described Tor the purpose of eliminating two or three propositions, which, however simple and obvious, can not be lost sight of without rendering unintelligible the discussion of the questions before us. They are these:
1. Providing revenue sufficient to meet either prospective or accruing debts authorized to be incurred, or to meet even debts overdue, still leaves them unpaid, and they must remain debts, contingent or absolute, until a law is passed appropriating the public revenue to meet them, and until they are afterward paid.
2. If, however, the constitutional provisions are complied with, ■and both revenue is provided and appropriations are made to meet expenses or claims, prospective or accruing, for the period of two years, such accruing liabilities, contingent or absolute, are not deemed debts, public funds having been provided and set apart by appropriation for their immediate payment.
It will be seen at once, when these propositions are applied to the •contracts before us, that this financial system and the contracts *are wholly inconsistent with each other. While each general assembly is required to provide revenue and make appropriations for the period of two years, leaving no debt or liability behind, the general assembly existing when these contracts were made, and who, it must be maintained, had the constitutional power by law to authorize them, have undertaken, by contracts in behalf •of the state, to bind the state by present obligation to pay specific amounts of money to certain citizens for services and materials, to be furnished as well during the above-mentioned two years, as also during the period of three years thereafter. It is the three years thereafter — the liability created against the state the moment these contracts were signed, for the specific sums promised for the repairs of those three years — the volunteering on the part of that general assembly to provide for the repair of the canals during those three years, without the power of making appropriations to 'meet the liability thus authorized and entered into — it is these peculiar characteristics of the contracts which render them inconsistent with the system of finance and expenditure provided by the constitution. But we shall have occasion to recur to this subject again.
The question before us is, whether a contract binding the state to pay specific sums of money at a future period, without revenue *480 provided or appropriations made to meet it, is such a contingent-liability as may be entered into under this financial system, and the provisions of the constitution relating to debts ?
I. And first as to these contracts coming within the inhibitions of the constitution relating to debts. This question necessarily leads us to inquire as to the scope and operation, of the constitution relating to debts; what debts are inhibited; whether contingent debts are included in the inhibition; and whether these contracts create contingent debts.
If the constitution had contained simply the provision that “no debt whatever shall hereafter be created by or on behalf of the state,” without any exception or reservation upon these sweeping terms, then, as we have already stated, no liability could have been created for money, materials, or services — no ^contract entered into, binding the state, without revenue actually raised, and appropriations therefrom made; to meet the liability, during the fiscal year. And, inasmuch as, by another provision of the constitution, no appropriations can be made for a period beyond two years (article 2,-section 22), it follows that, if no debt whatever could be created, and no appropriation made beyond two years, then a present obligation and liability to pay at a period beyond two years, could not be made, because it could not be placed on the footing of liabilities which are provided for by appropriations, and would thei’efore be inhibited.
But there are exceptions made to this sweeping inhibition; and we inquire, in the next place, how far these exceptions affect the inhibition. The exceptions are contained in sections first and second of article 8, above recited. Those in the second section relate to cases when the existence of the government is in jeopardy, and need not be considered. It is the exceptions in the first section we are to consider. These must, to be rightly understood, be viewed in connection with article 12, section 4.
By article 12, section 4, the general assembly is imperatively commanded “to provide for the raising of revenue sufficient to defray the expenses of the state for each year.”
It was, no doubt, intended by this provision of the constitution, that payment should go hand in hand with expenses.
Providing, however, for the raising of revenue sufficient to meet appropriations or expenses, will not always bring it, and if the con.stitution, on the one hand, required all expenses to be paid as they *481 accrued, and on the other, inhibited every kind of debt, the state' might, under some exigencies, be without the means of paying current expenses; for although the general assembly may have performed their constitutional duty hy providing for raising revenue,, yet a failure or deficit might arise from famine or other overwhelming calamity, cutting off the means of the people to pay their-assessed taxes, or there might be an embezzlement of the public-moneys, requiring the state, in either case, to contract debts or-borrow money. So, too, a sudden casualty might arise during the-fiscal year, requiring an immediate and unexpected expenditure,, the amount of which could not be ^immediately raised by assessment, or a small indebtedness might be allowed to be contracted for current expenses under exigencies, to be determined by the general assembly.
Now it is only under the exigencies enumerated, that is:
First, when there is a casual deficit or failure in revenue, and* secondly, when, from some cause, the revenue provided is not sufficient to meet the expenses, that the state can contract any debt;. for, as an excejttion to the sweeping prohibition against the state-contracting any debt whatever, the constitution provides that “ the-state may contract debts to supply casual deficits or failures in revenue, or to meet expenses not otherwise provided for.”
But, lest these two specially excepted cases should be made a pretext for creating debts to an undue amount, it is provided that the-aggregate of such debts shall not exceed seven hundred and fifty thousand dollars.
But the general assembly might evade this limitation of amount, in two ways; first, they might construe it as meaning that seven-hundred and fifty thousand dollars was a limitation upon the aggregate amount of debts which were contracted under or by virtue of' a single law, or at one period of time, or at one session of the general assembly; or, secondly, they might construe it as not including-mere contingent debts; so that, whatever amount of contingent liabilities might be entered into, it might be said that the prohibition, did not extend to them.
To prevent any such abuse, the constitution provides that the aggregate amount of such debts, “ direct and contingent, whether contracted by virtue of one or more acts of the general assembly, or at. different periods of time, shall never exceed seven hundred.and fifty thousand dollars.”
*482 Another abuse was also guarded against .in this section. If any money is received by the state, upon the creation of a debt, it is required to be applied to the purpose for which it was obtained, or to repay the debt so contracted.
It may be deemed a waste of time to have stated at length the practical workings of the first section of article 8, which permits a limited amount of debts to be contracted- under certain specified exigencies, inasmuch as it is not, and can not be, claimed that *this section authorizes these contracts to be made. They are for $1,375,000; so that, if this section touches them, it inhibits them. But my object has been to show how carefully, on the one hand, the general assembly have provided that all expenses should be provided for and paid; and, on the other, how carefully they have guarded and protected the state from contracting debts, direct or contingent, except under special and specifically-named exigenoies; and even then limited the amount of such debts.
The constitution having provided that revenue should be provided to pay all expenses, and pointing out, in the first and second ¡sections of article 8, the particular circumstances under which debts might be incurred, then provides, in section three, that “ except •the debts above specified, in sections one and two of this article) no debt whatever shall hereafter be created by or on behalf of the ¡state.”
It is claimed by the counsel for the contractors, that “ no debt whatever ” means debts for borrowed money only. They say that ■the exception in the first section, to this sweeping inhibition, relates to debts for borrowed money only, and hence deduce the con•clusion, that this general inhibition in the third section must be .alike limited and restrained to debts for borrowed money only. Now we think legitimate rules of construction would lead to the -conclusion that if the first section related to debts for borrowed money, the third section must have been intended to cover every ■other kind of debt; for if the first section provides for and fully limits the creation of debts for borrowed money, what possible effect or force is given to the third section, if it only relates to debts of the same kind ? Admitting, then, that the whole of the first section, from the fact that it declares that the money arising from the creation of “ such debts shall be applied for the purpose for which it was obtained,” relates to debts for borrowed money only, it is manifest, that the general and sweeping inhibition of the third section *483 •does not deal with any particular class of debts; nor with the consideration of debts, whether they arise from services, borrowed money, or otherwise; nor simply with the particular *class of debts mentioned in the first and second sections, but prohibits any debt whatever.
We hold that the state is inhibited, by the third section, from contracting any debt whatever, except those specifically provided for in the first and second sections.
Is a contingent debt no debt whatever ? The statement of the question really answers it.
It might, perhaps, be sufficient to say, that the words “ no debt whatever,” are manifestly broad and comprehensive enough to include, in their inhibition, a contingent debt.
But the context, we think, shows that contingent debts were intended to be included.
The first section of article 8, limits, under certain circumstances, the creation of “ debts direct and contingent.” The third section does not mention either direct or contingent debts, but provides that no debt “whatever” shall be hereafter created. Debts contingent, as well as direct, are called debts, in the first section. Now the words “ no debt whatever,” being used in connection with the preceding clause, which denominates a contingent debt, a debt, can there be any doubt “ that no debt whatever” was intended by those who used these terms to include a contingent as well as every other kind of debt? If the debts mentioned in the first section are debts for money borrowed, we can not perceive how any one could suppose that the framers of the constitution should expressly limit the aggregate amount of such debts, and then with that exception, and by the terms “no debt whatever shall be created,” intend that contingent debts to any amount might be incurred, if not for borrowed money. We can not hold that a contingent debt is “ no debt whatever.” We can not, by any canons applicable to the interpretation of words and context, hold that the framers of the constitution, when they said “ no debt whatever,” distinguished between debts arising from borrowed money and other kinds of debts.
Contingent debts being inhibited by the third section, are the contracts before us contingent debts?
These contracts, by their own force, bind the state to pay to individuals, a certain amount of money, through the period of *five years. The moment these contracts were executed, they created a *484 present obligation on tbc part of tbe state to pay money at a future1 period. The only uncertainty or contingency which could prevent the liability of the state becoming absolute, would be non-performance on the part of the contractors. It is a debt of $1,375,000, contingent upon the furnishing of certain materials and .labor. Woare at a loss to perceive how these contracts can bo taken out of the definition of contingent debts.
It is said that the obligation of the state to pay expenses inherent in, and inseparable from, the operations of the government, are not debts in the sense of the inhibitions of article 8, inasmuch as tho-obligation to pay such expenses exists with equal force and to the same extent, without, as with, a contract by the state to pay them-.
But the expenses provided for by the contracts before us, are not inherent in and inseparable from the operations of the government,, as is claimed. . ‘
If the board of public works is not a permanent department of the government, like that of tho executive and judicial, but may be-dispensed with, and if the expenses of the repairs of tho public works are not, like the salaries of executive and judicial officers, devolved on the state as a permanent expenditure, the position taken can not be. sustained, and future expenses for the repair of the-canals are not constitutional obligations, inherent in the government, but subject to the discretion of the general assembly.
That the executive and judicial departments must necessarily exist, as long as the constitution remains in force, and that the expenses incident to their operation, are inseparable from their future1 existence, is undoubted; but the constitution, for obvious reasons, so provides for the existence of a board of public works, and for dispensing with the expenditure of money for the repair of the canals,. as to place the whole within the discretion and control of each general assembly. The constitution provides:
“So long as the state shall have public works which require-superintendence, there shall be a board of public works.”
Who is to determine how long expenses shall be incurred to repair the public works? Certainly the general assembly. And if *the general assembly deem it expedient to abandon their-repair or their superintendence, they may do so. The state has. already abandoned one of them, and the general assembly has the power to determine whether it will require superintendence, or continue to repair the others. All will admit that the state may at any *485 ¡time sell them. Neither the board of public works, therefore, nor the repairs, nor the amount of the repairs, is inseparable from the operations of the government. -The constitution presupposes that the state may dispense with this board. The obligations, however, of these contracts, if operative and valid, and the liability of the .state for the amount designated by-them, 'would exist against the state for the period of five years, were the state to sell the canals, .and thus cease “ to have public works which require superintendence.”
The position that the obligation of the state to pay the expenses of the repairs of the canals exists with equal force and to the same extent without as with the contracts under consideration, has perhaps already been satisfactorily answered; but, it may be added, that a subsisting contract, entered into by the state to pay for repairs, creating a present liability to pay specific sums of money annually, and a mere abstract constitutional obligation to keep the canals in repair, and to pay the expenses of such repairs, are obviously two different things: the one creates a direct liability for a specific sum of money to individuals; the other is the simple enunciation of one of the duties of the general assembly; — a duty, however, as we have before shown, coupled with a discretion, which relieves it of all the force of an absolute constitutional obligation.
But suppose it were an absolute constitutional obligation resting •upon the general assembly to provide for the repair of the canals. If the time and manner of fulfilling that obligation are distinctly and expressly provided for, and limited by the constitution, no argument, founded either on implied constitutional obligations or on the fact that repairs may be required five years hence, or that the amount of those repairs might be less under these contracts, or that the time of payment would be the same, has anything to do with the question, if the mode authorized and prescribed *by the constitution to provide for repairs, has not been adopted.
Our answer to this line of argument will, we think, not only .-show its fallacy, but the grounds of our objections to the law of 1845, and the contracts under it, will be more clearly defined.
This line of argument assumes, in the first place, that there'is a •constitutional obligation resting on the general assembly to provide •for the inherent and ordinary operations of the government, and among others the repair of canals; but the argument is silont both, as to the period of time and the manner in which the constitution. *486 requires each general assembly to provide for these operations and to pay for theim Instead of this obligation being an indefinite and theoretical duty; as stated by counsel, it is practical and specific in manner and time, and is devolved not on the general assembly as a perpetual body, but upon each general assembly convening biennially, and for the period of two years, and no longer. They must, do it, too, by appropriations made and revenue provided, and consequently without creating any debt whatever. And here their duty ends. The constitutional obligation passes over to their successors-'
If the general assembly existing when these contracts were made, and who are supposed to have authorized them, had undertaken, by-appropriations beyond two years (and that is the only mode in which they could authorize expenditures without creating debts,, absolute and contingent), to provide for the repair of the canals, their laws would have been unconstitutional and void. If this be not deemed an answer to the foundation of this whole line of argument-,, then we say further, that as to the fact that repairs beyond two-years would probably be needed, and expenditure therefor required, and for an amount probably equal to that designated in these contracts, and then paid, we answer, that whether the repairs would or would not be needed, and the amount of the expenditure and their payment were questions to be determined by the successors-of the general assembly who are supposed to have authorized these-" contracts to be made, and that general assembly have by their contracts not only determined that the expenditure should be made, and fixed the amount beyond *the control of their successors, but have also, in so doing, created a present liability against the-state to pay specific sums of money at such a period that they could not by appropriations provide for payment. Their authority to-provide, without revenue or appropriations, for the repair of the canals beyond two years, by contracts creating a present obligation, clearly can not be justified or constructively authorized from their duty to provide revenue and make appropriations for repairs for the period of two years only. The first creates a contingent debt upon a subject-matter beyond their sphere of duty, and relating to-expenditures required by the constitution to be provided for by their successors; the last creates no debt of any kind.
These contracts, then, so far as the inhibition of the constitution relating to debts is involved, stand precisely upon the same ground as any other contracts for expenditure, which the general assembly *487 have authorized, but provided no revenue and made no appropriations to meet the amount specified to be paid by the state when it becomes due. It is a contingent debt ripening into an absolute one, without money being set apart to meet and pay it. The contracts, indeed, can stand nowhere else than among inhibited debts, inasmuch as they are, in our opinion, and for the reasons which we shall now state, in addition to those already given, inconsistent, with the provisions of the constitution relating to expenditures and appropriations.
II. These contracts run for five years. The general assembly existing when these contracts were made, provided no revenue and made no appropriations to meet the gross amount.
If these contracts are valid, no subsequent general assembly could withhold a tax or revenue, or decline to make appropriations to-meet their specific amount. The legislative discretion of every subsequent general assembly is tied, and their responsibility for the-expenditure avoided; for the amount of revenue to be raised by taxation, and amount of appropriation to be made, are fixed by these contracts beyond their control.
Now let us inquire whether this is not in contravention of the-system of finance and expenditure provided by the constitution.
*The constitution provides that the sessions of the general assembly shall be held once in two years. The members are elected for -two years, and the constituency every two years canvass at the ballot box the official conduct of each representative.
Each general assembly determine the amount of revenue to be raised by taxation, and are required by the constitution to provide for raising sufficient to meet the.expendit-ures which they authorize, and thus become officially responsible for the amount of the appropriations. And in order to make this responsibility direct and practical, and to rest upon each general assembly during its term, the constitution prohibits any appropriation to be made for a period beyond two years.
This last provision is the key-stone of the whole system; for, as; the amount of the taxes depends entirely upon the amount of the appropriations, if the general assembly had no power or discretion to'determine the amount of appropriations, or if the amount were fixed by a law of their predecessors, so that they could not disturb it, they would evade all responsibility for the amount of the taxes, however oppressive and grievous they might be.
*488 It results from these .constitutional provisions:
1. The general assembly at each biennial session determine the amount of the expenditure for the two years of their official term, in all cases not otherwise predetermined by the provisions of the constitution; 2. They must take the responsibility of making the necessary appropriations for this purpose, otherwise no money can be paid; 3. They must assess a tax upon their constituency sufficient in amount to meet the appropriations.
There is a wholesome, practical wisdom in the two constitutional provisions, which require appropriations for expenditures, and the assessment of taxes to meet them, to be made by the same general assembly. Each member is thus compelled, during his official term, to visit upon his constituents the pecuniary consequences of his sanction of liabilities to be incurred and of appropriations made, and he places himself and his consummated acts in ■direct and immediate communication with his tax-paying constituents at the right time, and in a manner which servile partisans *may heed, and corrupt and mercenary leaders understand. Payment not only goes hand in hand with expenditure, but wasteful expenditures, instead of being concealed or mitigated by delay •of payment or the creation of debts, must be immediately made known to the people, through the demands of the tax-gatherer for the money. This system is wholesome in its effect upon those who control and can squander the taxes. They are made sensible that their delinquencies will be known by being immediately felt by ■ their constituents. It is wholesome in its effect upon the people. Their self-interest is provoked to prompt scrutiny into the conduct of their public agents. Aside from its economical effects, it is a . wise policy. It tends to protect the state from the corruption which inevitably follows generous expenditures, an evil much greater than unnecessary and burdensome taxation.
But all these restraints upon the members of the general assembly and their official responsibility for the amount of appropriations, -and taxes to be assessed, so wisely provided by the constitution, are ■set aside and annulled by the contracts under consideration.
Instead of being entered into for two years and appropriations made and revenue provided therefor, the contracts are made for five years; and, after the expiration of two of the five years the •contracts determine, and not the succeeding general assembly, what amount of appropriations shall be made, and consequently what *489 amount of revenue shall be provided for the repair of the canals. The general assembly afterward elected lose all power over the expenditure, all discretion as to its amount, and escape all responsibility to their constituents. If the state can be thus bound, and the general assembly be thus divested of the power and discretion to control the amount of appropriations for five years, it may be done for fifty years; and if it can be done in respect of the eanals, .all the other branches of the government can be farmed out for a like period and with like effect, upon the discretion, power, and responsibility of the general assembly, in respect of making provision for revenue to- meet expenses and determining the amount ■of appropriations. If all this can be *done, the provision of the constitution which prohibits appropriations being made for a period beyond two years, is practically and for all the purposes intended by the constitution annulled; for if the state is bound to expend and to pay the amounts of money specified in such contracts, the general assembly afterward becomes a mere bed of justice, convened by contractors to record laws assessing taxes and making •appropriations already fixed and determined in amount, and obligatory upon the state. We are of the opinion that the discretion, power, and responsibility of the general assembly conferred by the constitution were not intended to be, and therefore can not be thus •superseded; that no law could be passed under which an agreement between the board of public works and two or more citizens could, for any period beyond two years, divest the general assembly of its discretion and control over the appropriations or the amount of the appropriations to be made for repairs of the public works of the state.
III. Holding, as we do, that these contracts are in violation of the provisions of the constitution, the next inquiry is, whether the . board of public works, notwithstanding the inhibitions of the constitution, have power to contract a debt on behalf of the state, and whether the general assembly, through the board of public works, can determine and fix the amount of appropriations for repairs for the period of five years ?
The act under which the contract between the board and the plaintiffs was made, was passed, as already observed, in 1845. The constitution of 1851, instead of pointing out specifically the powers and duties of the board of public works, after providing for the establishment of the board, contains this provision: “Art. 8, sec. 13. *490 The powers and duties of said board of public works, and its several members, and their compensation, shall be such as now are or may be prescribed by law.”
It is insisted, by the counsel for the state, that this section vests only such powers and duties in the board as are in accordance with the other provisions of the constitution. On the other hand, the counsel for the plaintiffs must maintain that a law conferring powers *on the board, which are forbidden by the constitution to be exercised, are, notwithstanding, vested in the board, and may be exercised, by force of this reference: in other words, that the reference is not merely to laws vesting powers consistent with the other provisions of the constitution, but to laws vesting powers-forbidden to be exercised by or on behalf of the state. We do not think there can be any serious difficulty in the determination of this question. It might, perhaps, be enough to say that an express-inhibition against the general assembly, and all officer's acting for or on behalf of the state, creating a debt, or doing any other official act, must, necessarily, operate upon the board of public wox’ks,. unless there be an exception as clear and explicit as the inhibition, to vest in the board the inhibited power. But no such power is expessly vested in the board.
The reference to the laws prescribing the powers and duties of the board, is not a specific reference to any particular law, nor to-the subject-matter of creating debts on behalf of the state. It is a reference to moi’e than thirty different statutes, vesting powers-in the board, in harmony with all the provisions of the constitution. Among these statutes, however, are two, and perhaps more; one-of which, relating to .eminent domain, is abrogated by the provisions of the constitution upon that subject; and the other is the act under consideration, of 1845, which, so far as it authorizes-these contracts for the period of five instead of two years, is in conflict with the constitution, axid remained, for all practical purposes, obsolete until 1856, when these contracts were made. When the constitution of 1851 was adopted, the board of public works was vested, by law, with the power of taking private property before compensation made or secured; and were also authorized to appoint appraisers to fix the compensation. Swan’s Stat. (ed. 1840) 748, sec. 5; Ib. 761, sec. 56; Ib. 181, sec. 33; Bates v. Cooper, 5 Ohio, 115. If this law had not been superseded by the act of February 28,1852 (Swan’s Rev. Stat. 761). it could have been claimed, it seems *491 to us, with equal propriety, that the provisions of the constitution-relating to eminent domain, were not operative against the board-of public works. It would, to say the least, be somewhat singular, that the organic law relating *to eminent domain, and forbidding the creation of a debt, and the provisions relating to revenue and appropriations, enunciated without reservation or exception, in the constitution, should be abrogated or annulled by a reference to a mass of laws pointing out the powers and duties of the-board of public works.
If the reference had intended not only to vest in the board such powers as were in harmony with the constitution, but also-powers forbidden by the express terms of the constitution to be exercised, words would have been used to express the startling and extraordinary proposition that the laws referred to should have full force and effect, anything in the constitution to the contrary notwithstanding.
If this section of the constitution' intended that laws conferring-powers on the board, inhibited, or contravening other provisions of the constitution, should, nevertheless, have force and effect, it is on-the ground that the powers of the board are unaffected by that instrument. It follows that if the powers of the board, under laws> then in force, were not subordinate to the inhibition as to creating, a debt in behalf of the state, neither are the powers of the board,, under laws thereafter made, subordinate to this inhibition ; the constitutional provision being that the powers of the board “ shall be-such as now are or may be prescribed by law.”
If, then, we adopt the construction contended for by the counsel foi the plaintiff, we can not hold, simply, that the provisions of the constitution shall be made subordinate to the laws im force when, the constitution was adopted, but also that the provisions of the-constitution shall be made subordinate to all laws afterward enacted relating to the powers of the board. The general assembly, through the board, and the board itself, are thus, by construction, placed beyond the reach of all constitutional restrictions and limitations. This would be an entire disregard and abandonment of the constitution ; and, at the same time, a legitimate result of the construction contended for by the counsel of the plaintiffs.
We are of the opinion that the laws referred to are such only as-are in harmony with the constitution.
W e have conceded that the 1st section of article 8 relates ex *492 clusively *to debts for borrowed money. We have done so ■because the counsel for the plaintiffs so insisted, and because, whether this be a correct construction or not, was, in our view of the 3d -section, immaterial to the question involved in this case. It is clear that the section limits the aggregate amount of debts, of every 'kind, which may be created ; but whether the debts making up the .aggregate may not be any debt direct or contingent, as well for ■borrowed money as for materials and services, we deem it unnecesary ■to decide in this case.
In holding these contracts invalid, we do not enter upon the •Question whether they were obtained by collusion or unfair means. ‘That question is not .before us. If, however, the contracts were fairly entered into, and the plaintiffs were induced, by the mutual -mistake of all parties, to expend their means in preparations to rperform the contracts, and have thereby incurred losses, the judgment we give in this case would be a very painful duty, if we entertained the belief that the state would avoid these contracts, and, .at the same time, withhold from the contractors payment of the • amount of losses sustained by them in their investments and expenditures made in good faith under the contracts. But as no principle of fair dealing between men would justify such a course, •we entertain no doubt but that the state will accord to these contractors a fair judicial inquiry into the question of collusion and fraud, and a liberal and honorable adjustment of their just claims ■to indemnity, if the contracts were fairly and honestly made. ,
Brinkerhoee, Scott, and Sutlife, J J., concurred.